# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| MARK ELKINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 06 cv 823 |
| | ) | Judge Gettleman |
| OCWEN FEDERAL SAVINGS BANK | ) | Magistrate Judge Cox |
| EXPERIAN INFORMATION SOLUTIONS, INC. | ) | |
| AND EQUIFAX INC. | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Magistrate Judge Susan E. Cox

This matter was referred to the Court on defendants' motion to strike opinions of plaintiff's expert [#221]. For the reasons set forth below, defendants' motion is granted in part and denied in part.

### Procedural and Factual History

Plaintiff Mark Elkins originally brought a four count complaint against defendants Experian Information Solutions, Inc. ("Experian"), Equifax Information Services, LLC ("Equifax") and Ocwen Federal Savings Bank ("Ocwen"). The district court entered summary judgment against plaintiff on Count Four which alleged that Ocwen violated the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2605. In addition, plaintiff has settled its claims against Experian. Therefore, the only claims remaining in the case are that defendants Ocwen and Equifax violated the Fair Credit Reporting Act, 15 U.S.C. § 1681 ("FCRA").

The essence of plaintiff's claim is as follows: he obtained a loan from Ocwen to buy property at 1816 Whitney Drive Hanover Park, Illinois. Prior to paying off his loan, plaintiff filed for bankruptcy under Chapter 13 of the Bankruptcy Code. Plaintiff's loan with Ocwen was identified on the Trustee's Final Report and Account, which stated that the loan was paid in full. However, Ocwen reported to credit reporting agencies, including Equifax, that his loan was discharged in bankruptcy. Equifax (and others) continued to show that the loan had been discharged even after plaintiff made efforts to correct this misstatement with Ocwen and Experian and after Ocwen acknowledged the error to plaintiff.

Plaintiff alleges that Equifax violated the FCRA in several respects. First, Equifax did not maintain reasonable procedures to assure the maximum possible accuracy of plaintiff's credit report. Second, Equifax did not conduct a reasonable reinvestigation of plaintiff's credit report. Third, Equifax improperly reinserted false information into plaintiff's credit report. Ocwen allegedly violated the FCRA by: (1) not completing an inquiry into the facts concerning plaintiff's loan and providing inaccurate information to the credit reporting agencies regarding that loan; (2) reporting erroneous credit information with actual knowledge of the errors; (3) following reinvestigation of the errors, continuing to report false information and failing to notify the credit reporting agencies that the debt was disputed; and (4) failing to put into place procedures to complete a reinvestigation of disputed credit information.

Plaintiff has proffered an expert, Richard F. LeFebre, on several issues relevant to the resolution of this case. Mr. LeFebre was extensively deposed concerning the opinions in his expert report. After his deposition, defendants filed a motion to strike certain portions of his report under

Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Prior to the resolution of that motion, Mr. LeFebre died. The district court has ruled that the report is not hearsay, but has left open the issue of what portions of the report are expert opinion under Rule 702 for our resolution.

Mr. LeFebre's report, as originally drafted, is lengthy and repetitive. In many places, it reads more as a closing argument for the plaintiff than an expert opinion. Defendants originally moved to strike Opinions One, Four, Five and Six of Mr. LeFebre's report. At the oral argument on defendants' motion to strike, plaintiff agreed to delete Opinion Five (in which Mr. LeFebre opined on plaintiff's alleged emotional distress) and parts of Opinions One and Four because there was no foundation in the record for these statements. In addition, all of Mr. Lefebre's opinions are preceded by a long executive summary. Plaintiff also agreed to delete certain portions of that summary. For the parties' convenience, the Court has double-scored the agreed upon deletions in the report which is attached hereto.

In Opinion One, Mr. LeFebre opined that "Ocwen did not handle their responsibilities as a data furnisher by using good sound procedures and judgments after plaintiff's numerous disputes [regarding the reporting of his loan] directly and indirectly through numerous credit reporting agencies." In his opinion, Mr. LeFebre specifically addresses the inconsistencies in Ocwen's reporting of the loan, even after plaintiff brought the problem to its attention. He opines that Ocwen's reporting of the debt did not meet the standard of care within the credit industry. Additionally, he also devotes several pages to Ocwen's unsound policies and practices in general over the years and its failure to train its employees to use better practices. Finally, he ends his opinion with a generalized condemnation of the credit and lending industries, including Ocwen,

which, in his view, are too quick to believe that "CONSUMERS ARE LIARS." (emphasis his.)

In Opinion Four, Mr. LeFebre contends that, in his opinion, "defendants' misconduct directly caused injury to plaintiff as it relates to the standard of care within the credit industry." He then explains how defendants' actions negatively affected plaintiff's credit scores and caused certain economic harm. Finally, in Opinion Six, Mr. LeFebre expounds on this view, opining that plaintiff has suffered "substantial ongoing damages from the actions of defendants." This opinion essentially deals with the adverse feelings that plaintiff experienced, as well as the emotional impact of being treated as defendants allegedly treated him. The Court will address the defendants' objections to the remaining portions of Opinion One and Four, and to Opinion Six in its entirety.

## Applicable Legal Standards

In *Daubert*, the Supreme Court provided a non-exhaustive list of factors courts could consider when determining whether to admit expert testimony, including whether the opinion can be (and has been) tested, whether it has been subjected to peer review and publication, whether there is a known or potential error rate, and whether it is generally accepted in the relevant scientific community. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 593-94 (1993). Of course, the *Daubert* factors are more geared toward scientific testimony rather than the testimony at issue in this case. Experts are not disqualified from testifying if these factors cannot be established. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 150 (1999). All that is required is that "an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152. The critical inquiries are whether the "expert testimony at issue 'both rests on a reliable foundation and is relevant to the task at hand.'" *United States v. Cruz-Velasco,* 224

F.3d 654, 660 (7th Cir. 2000) (quoting *Daubert*, 509 U.S. at 597). The Supreme Court's holdings

in *Daubert* and *Kumho Tire* have been codified in Federal Rule of Evidence 702 which provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

With these principles in mind, the Court turns to the specific opinions challenged in this case.

### Opinion One

Defendants contend that there is no foundation for Mr. LeFebre's opinion that Ocwen's

actions toward the plaintiff demonstrated unsound practice and judgment below industry standard.

There is no question that Mr. LeFebre possesses the qualifications to testify as an expert about the

credit industry. He is a former owner and operator of a credit bureau himself, was the owner of an

independent escrow company, and worked for a mortgage broker for several years. He has reviewed

and processed 30,000 credit applications, and processed, updated and corrected more than 75,000

individual consumer disputes between the three national credit bureaus (like defendant here), credit

furnishers (like Ocwen) and consumers (like plaintiff). That he possesses the requisite understanding

of the credit reporting industry and how it should work seems obvious here. Defendants do not

contend otherwise. Instead their argument focuses on the fact that Mr. LeFebre admitted that he did

not have all of the Ocwen discovery when he rendered his opinion and that he testified that he did

not review Ocwen's policies and procedures in his deposition. It is true that in his deposition, Mr.

LeFebre plainly states that he did not remember seeing anything regarding Ocwen's policies and

procedures. But, in fact, he was mistaken. As plaintiff points out, the materials which Mr. LeFebre lists that he reviewed in rendering his expert opinion include Ocwen manuals regarding credit disputes, escalation process resolution, and other Ocwen policy manuals. Further, his deposition testimony makes it very clear that he is throughly familiar with what occurred with respect to the reporting of the debt in this case. It is his view, based on a review of all of the listed materials, that Ocwen reported the debt inconsistently and he specifically describes those inconsistent ratings. He further states that Ocwen's inconsistent reporting after the plaintiff began the re-investigation process was below the industry standard which demands a higher standard of accuracy. He concludes, based on his experience in the credit business, that Ocwen was well aware of the danger that such inconsistent reporting could present to plaintiff's overall credit worthiness.

So far, so good. These opinions are not only supported by plaintiff's deposition testimony and the materials he reviewed, but are reasonable based on his vast expertise in the credit field. However, these limited valid opinions, which would assist the jury, are surrounded by statements which condemn all of Ocwen's credit procedures as fundamentally inadequate, as well as conclusory statements that Ocwen's employees must be inadequately trained. Much of these sweeping statements seem based on Mr. LeFebre's personal view and are not sufficiently backed up by specific evidence in the record. For example, Mr. LeFebre talks about Ocwen's "lack of quality standards" in the industry without ever stating what the basis for this belief is. He concludes that Ocwen employees had "no clue" about how to reinvestigate distorted information, but admits in his deposition that he is only talking about one employee. He uses words like "substandard, reckless and unreliable" but does not back up these conclusions with facts and a methodology. His opinion draws many legal conclusions about the appropriate burden placed on Ocwen by Congress to be

accurate which are clearly inadmissible under governing law. "Expert testimony as to legal conclusions that will determine the outcome of a case is inadmissible." *In re Ocean Bank,* 481 F. Supp. 2d 892, 896 (N.D. Ill. 2007), *citing Good Shepherd Manor Foundation v. City of Momence,* 323 F.3d 557, 564 (7th Cir. 2003). He concludes by describing the minimum standard for adequate procedures under the FCRA, but does not tell us why, in his opinion, Ocwen failed to meet this standard except in the most conclusory way. "An expert who supplies nothing but a bottom line supplied nothing of value to the judicial process." *Minasian v. Standard Chartered Bank, PLC,* 109 F.3d 121, 1216 (7th Cir. 1997).

In short, much of this Opinion simply does not meet the standard of Rule 702 and *Daubert* because it does nothing but offer conclusions without methodology or evidentiary foundation. The Court has therefore redacted Opinion One to reflect only that portion of Mr. LeFebre's opinion which is backed up by specific evidence in the record and can be fairly drawn from his experience in the industry. Simply put, Mr. Lefebre is qualified to state his opinion that Ocwen inconsistently reported the plaintiff's debt and that its process, including its re-investigation procedure, as to this specific transaction did not meet industry standards as Mr. LeFebre understood them based on his experience. The Court has redacted the reference to "re-aging" because Mr. LeFebre admitted specifically in his deposition that this was an assumption of his. The remaining portions of the opinion also are stricken. For the parties' convenience, the portions of the Opinion which have been redacted by the Court have been scored through. (See Court's Redacted Opinion.)

## Opinion Four

In Opinion Four, Mr. LeFebre opines that the defendants' "misconduct" directly caused injury to plaintiff. (Of course, whether defendants' actions are indeed misconduct under the

statute is a question for the jury. ) There are two prongs for this opinion. In the first, Mr. LeFebre states that the misreporting of plaintiff's debt caused Countrywide Mortgage to take seven adverse actions against him. Defendants attack that statement as a conclusion based on Mr. LeFebre's assumption that there were, in fact, such adverse actions. However, Mr. LeFebre admitted in his deposition that he did not review any such adverse actions. His opinion that there were adverse actions is not based on any facts or data, as required by the plain language of Rule 702, but instead on an assumption which has no foundation in the record. Accordingly, it is stricken.

In the second prong of Opinion Four Mr. LeFebre opines that plaintiff is paying a higher interest rate as a result of defendants' actions than he would have absent their actions, and is, in general, viewed as less credit worthy. Defendants argue that this opinion is based entirely on an interview with Brett Immel of A & N Mortgage, and lacks any further foundation in the record, but they are incorrect. In both his opinion and in his deposition Mr. LeFebre makes it clear that he also is relying on his own vast experience in the field, including his ownership of a credit reporting agency and work as a mortgage broker himself, to render his opinion. Defendants conceded at oral argument that the determination of an interest rate was not an exact science, so the absence of a precise formula which Mr. LeFebre could explain does not invalidate his opinion under Rule 702. Defendants thoroughly cross-examined that opinion and its ultimate credibility will be an issue for a jury. But the Court is unwilling to say that it is without foundation under Rule 702. We also find that Mr. LeFebre's general statements about the impact of inconsistent reporting on any assessment of plaintiff's credit worthiness is appropriate expert opinion given his expertise in the field.

## Opinion Six

The Court strikes this opinion in its entirety. In this opinion, Mr. LeFebre reiterates his view that plaintiff was damaged by defendants' actions. Much of this opinion is cumulative and unnecessary given Mr. LeFebre's testimony in Opinion Four. The Court also finds no basis for Mr. LeFebre's sweeping statements concerning damages. He includes as elements both the unquantifiable costs to plaintiff of clearing his name and reputation, and his ultimate frustration with defendants' actions and inactions in this case. There simply is no foundation for this testimony. In addition, other courts clearly and correctly have held that Mr. LeFebre is not an expert in the area of plaintiff's emotional distress. *Molina v. Experian Credit Info. et al,* No. 02-C-5561. (N.D. Ill. Feb. 12, 2004); *Warmus v. Equifax Info. Services,* No. 05-C-1427 (M.D. Fla. Dec. 13, 2006); *James v. Equifax Info. Services,* No. 05-C-1428 (M.D. Fla. Jan. 12, 2007). Indeed, plaintiff has conceded this and has redacted this material from other parts of the expert report.

The remaining parts of this opinion detail (in general) the damage to society and consumers in general when credit reporting is not accurate which, in the Court's view, is not relevant to any issue in this case. This testimony is more fairly characterized as an argument rather than expert opinion. Accordingly, Opinion Six is stricken.

## Other Redactions

The Court has reviewed the executive summary of the opinion in light of its rulings stated above and has redacted portions of the summary to conform to them. It has also struck aspects of the opinion which are redundant, argumentative, and where Mr. LeFebre has drawn inappropriate legal conclusions.

**IT IS SO ORDERED.**

U.S. Magistrate Judge
Susan E. Cox

Date:   November 13, 2007

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

MARK ELKINS )
   Plaintiff, )
  )
  ) Case No. 06-C-823
vs. ) Judge Robert W. Gettleman
  )
OCWEN FEDERAL SAVINGS BANK ) Magistrate Judge Keys
EXPERIAN INFORMATION SOLUTIONS, )
and EQUIFAX, INC. )
  )
  )
   Defendants. )

### <u>PLAINTIFF'S RULE 26(a)(2) EXPERT WITNESS REPORT</u>

I, Richard F. Le Febvre, the undersigned, upon oath hereby depose and state the following: I have prepared the following Expert Report for your examination and consideration in the above-named action. The following statements are based upon my personal and specialized professional knowledge, experience, and training I received as a credit reporting agency ["CRA"] loan officer/manager, and escrow agent/owner, and are within a reasonable degree of credit and lending certainty.

I have been asked to examine relevant supplied documents, court filings, discovery, and other information deemed appropriate regarding this case, in order to determine whether, based on my background, experience, and knowledge as a past consumer reporting agency in the field of consumer credit, re-scoring, and lending, I can offer independent and reliable opinions based on the facts in this case.

The bases for, and the main reasons supporting, my opinions include the following: (1) documents I received and reviewed as I specified in my material reviewed and examined section of this report listed below, (2) my own experience (all disclosed in my CV), training, and education gained through industry, (3) my continued study within the credit industry, including

my analysis in re-scoring credit scores, which includes various credit scoring systems and versions, and (4) my continued study of the lending and escrow industries and how those industries are affected by consumers credit behavior, which includes accounts listed in bankruptcy or not listed in bankruptcy and how those affect consumers.

**Background & Qualifications (Curriculum Vitae Attached)**

~~My opinions are well founded and based on my 15+ years in the credit industry and based upon years of research and training. I will be able to assist the trier of fact in understanding the following: (1) interpreting consumer credit reports, (2) how they are used, (3) how they affect consumers, (4) how credit scores are generally used within industry, (5) how to conduct an *adequate* reinvestigation as a CRA and an *adequate* investigation as a data furnisher, (6) how the lack of *adequate* procedures by industry harms consumers, (7) how in some cases the use of ACDV's in certain disputes can not assure true accuracy, (8) how inaccurate credit information affects a consumers overall credit scores, credit worthiness, and credit reputation, (9) how reporting a major derogatory account when the subject account had been paid "*as agreed*" harms consumers, and (10) how industry judges consumers when making their lending decisions.~~

~~I will explain to the *trier of fact* how to complete an adequate and reliable reinvestigation, using good old common sense, and standards within the industry. At the same time I will show how to assure true accuracy regarding a consumer's complaint involving a mortgage account which was listed in his bankruptcy. This account was paid as agreed, but was still showing as charged off, a paid charge off, settled for less then full value, discharged through bankruptcy, or other major negative rating when he included and listed it through his personal bankruptcy. The industry calls this type of account, an account that needs to be "*Re-listed*". They are *false*, *inaccurate*, and *misleading*; which then leads to further consumer embarrassment, lower credit~~

~~scores, and credit damage. This credit damage creates an unfair advantage for industry over~~
~~helpless consumers and their protected *privacy*.~~

Comment [MSOffice1]: This material is argumentative and cumulative.

I have been retained as an expert witness over the last five years and I have been designated in over one hundred cases. In those cases I have had the opportunity to read thousands of pages of deposition testimony by industry, review, and assist lawyers in numerous depositions and gathering records and documents, which the public does not have access to. These documents, discovery, and procedures by industry are highly proprietary and not usually known by the general public. These records have confirmed and backed my opinions in many cases. I was trained by many of the businesses that created them (TransUnion, Experian, and Equifax) and I worked closely with *thousands* of data furnishers like Sears, Bank One, American Express, Ocwen, Bank of America and others over my 15+ years as a credit reporting agency (CRA).

~~This is significant because these industries do not openly discuss or publish their procedures and practices for handling consumer reports, their matching criteria (what data goes into a consumers report), and procedures for handling consumer disputes as a CRA and data furnisher. These industries clearly don't openly discuss their procedures for assuring accuracy both pre and post dissemination of a consumer report direct to the consumer or third party. In fact, the repositories typically consider their procedures, tactics, and practices to be proprietary and trade secrets. They usually do this even between themselves and won't share amongst each other. The credit reporting industry is very competitive and in general *Equifax* has the *dominate* file on the East coast, TransUnion has the dominate file in the Midwest, and Experian has the dominate file on the West coast.~~

Comment [MSOffice2]: This material is not relevant. In addition, it is cumulative of what is stated in the opinion later.

I have prepared the following Expert Report for your examination and consideration in the above-named action. Your firm has retained me to review, and opine, on the defendants' conduct, in this case as shown by the materials your firm has provided me to date. At your request, I reviewed those materials regarding Mark Elkins case against the defendant Ocwen Federal Savings Bank ("Ocwen"), Equifax Information Services LLC ("EFX"), and Experian Information Solutions, Inc ("XPN").

I have reviewed the Plaintiffs large discovery in this case and reviewed the large discovery from the named defendants'. ~~Based on the large discovery at this time I can give my opinion, but reserve the right to amend my report when and if the plaintiff or the defendants' provide additional discovery as they have in other cases where I was named as an expert.~~ I will base my opinion on pattern and practice, standards within the CRA, CRA/reseller, and furnisher industries, my training, experience, and knowledge as a CRA.

> **Comment [MSOffice3]:** Obviously there will be no amendment of this opinion so the Court struck this.

~~When data furnishers like Ocwen (the suppliers of credit information) and the repositories like Equifax and Experian (the *gatekeepers*) don't use good sound *ethical* procedures our banking system is at risk of a true lack of consumer confidence, which could lead to a banking collapse. Congress and the FTC clearly mandated *privacy* and *accuracy* as a credit industry function.~~

> **Comment [MSOffice4]:** There is no foundation for these statements

Did Ocwen perform their investigations of the subject account and were they *adequate* and *reasonable* based on the standards within the industry? Did Equifax and Experian have *adequate* and *reliable* procedures in place to handle numerous accounts ~~that were *false, inaccurate, and misleading*~~? Did defendant Equifax and Experian have or should they have had good sound procedures and polices in place to resolve the plaintiffs disputes, regarding the need for his account to be *re-listed* and shown as paid as agreed and not delinquent? In addition, when

> **Comment [MSOffice5]:** This sentence does not make sense.

Equifax and Experian performed their reinvestigations of the subject account were they *adequate* and *reasonable* based on the standards within the industry? Did EFX and XPN perform their own *independent* reinvestigation based on the conflicting and supporting data supplied by the plaintiff?

## **Executive Summary:**

The plaintiff's case/dispute involves a very simple set of facts over three (3) years. The *first* issue involves the *false* reporting of bankrupt tradeline that was *not* discharged through the plaintiff's valid bankruptcy. The *second* issue involves the subject account reported as either charged off, a paid charge off, settled for less then full value, discharged through bankruptcy, or other major negative rating when the subject account was paid in full through a refinance on or about January of 2002 and not discharged through his personal bankruptcy.

The *third* issue involves in my opinion Ocwen, Experian, and Equifax's failures and their lack of quality investigations/reinvestigations regarding the subject account that the plaintiff disputed possibly *six* (6) times starting as far back as 2003, but there is a question into the total number of disputes of which many were done verbally.

~~The nightmare began for the plaintiff on or about June of 2003 and continued through the middle of 2006 when he filed suit that in my opinion created the subject Ocwen account to finally stay corrected. Over a period of years the subject Ocwen account would be fixed and corrected and then flip-flop back and forth numerous times over the years. In my opinion, Equifax and Experian allowed their subscriber to play games with the plaintiff by slightly changing the rating and other data elements.~~

~~Based on my interview with the plaintiff he clearly stated that he felt his Equifax and Experian credit reports were used in an attempt to force him to pay rates for new loans. His credit reports clearly show me that he has paid his bills on time over the years before filing~~

bankruptcy, after being discharged, and currently. He clearly stated to me he felt embarrassed, humiliated, and upset that he was being reported in a negative light and someone who stuffed his creditors out of money again after his bankruptcy. This created him to feel *humiliation* which left him financially *immobilized*.

Comment [MSOffice6]: This is a recitation of plaintiff's feelings and not expert opinion. Plaintiff already has agreed that Mr. LeFebre is not an expert on emotional distress issues. The other matters stricken are cumulative and repetitive what is stated later in the opinion.

Based on my specialized knowledge, experience, and training, interview with the plaintiff, review of the defendants' discovery, and plaintiff's documentation, I state the following opinions within a reasonable degree of credit certainty.

In my opinion, this is one of the worst failures to report accurate credit information, failure to realize it, and failure to follow industry standards I have seen over the years. In addition, all of the defendants' provided substandard and *reckless* care and lacked good sound procedures during the dissemination of plaintiff's credit file from Equifax and Experian's proprietary database called "ACRO" and "File-One", which is controlled, maintained, and protected *exclusively* by Equifax and Experian.

Comment [MSOffice7]: This argument and lacks foundation. Further, as stated in the Court's opinion, there is no foundation for such a broad conclusion regarding Oewen's policies and procedures in general.

Many of the reinvestigations done by Equifax and Experian were inadequate and not done to the standard of the industry. Equifax and Experian were stating to other third parties that the plaintiff again stuffed a creditor even after he filed for bankruptcy and was discharged. In addition, Equifax reinserted previously deleted derogatory data without proper notice to the plaintiff.

As a result of the defendants' actions the plaintiff has suffered additional credit damage, embarrassment, and emotional distress as it relates to his credit worthiness, credit scores, credit capacity, and his overall credit reputation. The defendants' actions in this case over a period of over three (3) years created additional loss of time and effort, additional adverse action notices, an actual higher risk assessment, economic loss, mental anguish, humiliation and frustration, and

~~loss of opportunity for the plaintiff. Plaintiff has suffered a grave loss of trust regarding our credit system that continues to impact his day-to-day life as of my interview and my review of plaintiff's deposition.~~

I can link, based on my review of the entire discovery in this case, the plaintiff's damages to the actions of all\ the defendants'. ~~I clearly see~~ *substandard and reckless* ~~care on at least *six* disputes/reinvestigations which caused damage in the following ways:~~

**Ocwen:**

1. Ocwen provided *substandard* care with plaintiff's personal information and did not follow the standard of care relating to reporting consistent credit information;

2. Ocwen *failed* their furnisher responsibilities and did *not* follow industry standards during the plaintiff's numerous disputes;

3. ~~Defendant Ocwen in my opinion has no *reliable* procedures in place to protect the plaintiff's privacy post his first dispute based on standards within the industry;~~

4. I see a causational link between Ocwen's actions and their *failures* during their investigations and the plaintiff's credit damages. These actions by defendant relate specifically to plaintiff's ability to seek credit better known as "credit opportunity" and the damages sustained from that "loss of opportunity";

5. ~~At this time, based on my knowledge and belief, there were numerous adverse actions that were the result of the defendants' actions;~~

6. Ocwen created lower credit scores for plaintiff, which led to a *higher* risk assessment for new potential lenders and his current creditors who viewed the plaintiff's credit files. This lead to the plaintiff being ~~falsely~~ judged as ~~a further *deadbeat* and within industry meant the consumer was~~ a higher credit risk to lenders;

---

**Comments (margin):**

**Comment [MSOffice8]:** See above comments re: emotional distress.

**Comment [MSOffice9]:** See Memorandum Opinion and Order.

**Comment [MSOffice10]:** Mr. LeFebre testified that he did not see any adverse actions.

**Comment [MSOffice11]:** Argumentative

7. ~~A reasonable standard of care was not maintained by Ocwen's management staff to ensure plaintiff's privacy and his protected rights;~~

8. ~~Management knew, or should have known, that there was a built in consumer protection within the FCRA, their employees did not maintain or were not trained to use good quality control standards, during the plaintiffs numerous investigations, which these failures showed *inadequate* investigations in today's day and age of risk based pricing which leads to consumer harm;~~

9. ~~Ocwen failed to properly manage, train, and alert their employees to the FCRA, regarding reporting and accuracy issues, and what to do in case they are put on notice of such a complaint.~~

**Comment [MSOffice12]:** See Memorandum Opinion and Order

**Equifax:**

1. Equifax failed to provide adequate accuracy, the standard of care within the industry, and lacked good sound procedures and safeguards when they produced their proprietary and trademarked reports to third parties;

2. Equifax has known for years of this exact issue of *re-listing* and they have chosen not to make adequate changes to their policy and procedures to implement it;

3. I confirmed the plaintiff had *numerous* disputes with EFX regarding the subject account in question;

4. In my opinion, Equifax performed substandard and inadequate reinvestigations regarding the plaintiffs disputed account;

5. Equifax failed to accept industry standard documentation directly from plaintiff regarding the subject account;

6. Equifax reinserted previously deleted data without proper notice to the plaintiff as required under the FCRA creating further credit damage for the plaintiff;

7. Equifax could have lessened the plaintiffs damages and distress to a degree under which the plaintiff would have had less credit damage if they had just used a reliable check and balance system before they generated their reports to third parties when they were put on notice by the plaintiff numerous times over the years;

8. I see a causational link between the defendants' actions and the way they reported the named account on the plaintiffs credit file. These types of under notated accounts will lead and did lead to lasting damage sustained by the plaintiff when he applied for credit, which lead or possibly lead to his damage with other creditors;

9. Equifax does not always report the mandated date of first delinquency, allows that date to change without verification, and/or allows their subscribers to report data without this mandated date, which caused damage for this plaintiff;

10. Equifax does not report the two data fields in Metro II (which are both saved in their ACRO database), but not disclosed on subscriber or disclosure reports. The *date of last activity* and *date of first delinquency* instead are shared within one data field called "date of last activity". These two fields are not always the same and since they are not it creates re-aging and in my opinion this violates the FCRA;

11. Equifax created lower credit scores, which lead to a *higher* risk assessment for any new potential lender or current creditor who viewed the plaintiffs EFX credit file. ~~This lead to the plaintiff being falsely judged as a *deadbeat* (again) and within industry.~~ [This meant that] the consumer was a high credit risk to lenders and a strong chance of loan buyback if funded.

**Comment [MSOffice13]:** See Comment 9.

**Experian:**

1. Experian failed to provide adequate accuracy, the standard of care within the industry, and lacked good sound procedures and safeguards when they produced their proprietary and trademarked reports to third parties;

2. I confirmed the plaintiff had *numerous* disputes with XPN regarding the subject account in question;

3. In my opinion, Experian performed substandard and inadequate reinvestigations regarding the plaintiffs disputed account with Ocwen;

4. Experian failed to accept industry standard documentation directly from plaintiff regarding the subject account with Ocwen;

5. Experian could have lessened the plaintiffs damages and distress to a degree under which the plaintiff would have had less credit damage if they had just used a reliable check and balance system before they generated their reports to third parties when they were put on notice by the plaintiff numerous times over the years;

6. I see a causational link between the defendant's actions and the way they reported the named account on the plaintiff's credit file. These types of under notated accounts will lead and did lead to lasting damage sustained by the plaintiff when he applied for credit, which lead or possibly lead to his damage with other creditors;

7. Experian does not always report the mandated date of first delinquency, allows that date to change without verification, and/or allows their subscribers to report data without this mandated date, which caused damage for this plaintiff;

8. Experian created lower credit scores, which lead to a *higher* risk assessment for any new potential lender or current creditor who viewed the plaintiff's XPN credit file. This lead

~~to the plaintiff being falsely judged as a *deadbeat* (again) and within industry~~ [This meant] the consumer was a high credit risk to lenders and a strong chance of loan buyback if funded.

Comment [MSOffice14]: See Comment 9

## TABLE OF CONTENTS

| Page Number(s) | Chapter Title |
|---|---|
| 1 – 4 | Background & Qualifications |
| 5 – 10 | Executive Summary |
| 11 | Table of Contents |
| 12 – 13 | Material Reviewed and Examined |
| 14-30 | Background on Industry and Terms |
| 31-52 | Summary of Finding and Opinions |
| 52-53 | Conclusion |
| 54 | Signature |

## Material Reviewed and Examined

### A. Plaintiff's Discovery

1. The plaintiff's complaint filed in February 14, 2006;

2. Plaintiff's Bates stamps labeled Elkins 000001 — Elkins 002537;

3. All plaintiff's pleading in this case;

4. A&N Loans and full loan packages:

      a)    138 W Marilyn

      b)    1127 Brentwood

      c)    1319 Parmele

      d)    1816 Whitney

      e)    2711 W.97th

      f)    5758 S. LaSalle

      g)    10020 Country Clue

### B. Ocwen's Discovery

1. 0001-0023: Loan report

2. 0024-0028: Credit Bureau Request instruction manual

3. 0029-0044: "Detailed Understanding of CRA History" manual

4. 0045: 6/8/2003 Equifax dispute form

5. 0046: 6/20/2003 Experian dispute form

6. 0047: 9/11/2003 Experian dispute form

7. 0048: 12/8/200 Ocwen letter to Caroline K Elkins

8. 0049: 4/23/200 Ocwen letter to Caroline K Elkins

9. 0050: 8/29/2003 Ocwen letter to Caroline K Elkins/Mark Elkins update

10. 0051: 1/31/2005 Mark Elkins letter to Ocwen

11. 0052-0053: 2/9/2005 Ocwen letter to Mark Elkins

12. 0054: 2/13/2005 Ocwen letter to Caroline K Elkins/Mark Elkins

13. 0055-0101: Credit Dispute Verification manual

14. 0102-0103: Dispute Workflow path manual

15. 0104-0109: Root Causes manual

16. 0110-0169: Dispute Scenarios manual

17. 0170-0173: Escalation Process manual

18. 0174-0177: Frequently Asked Questions and Answers manual

19. 0178-0 179: Sample Letters Sent by Other Departments manual (BLANK)

20. 0180-0181: Applicable Internet Sites

## C. Equifax's Discovery

1. none at this time;

## D. Experian's Discovery

1. Bates stamps labeled Ex-Elk 0001 — Ex-Elk 0608;

## E. Depositions

1. Kimberly Hughes dated 6/20/06 and attached exhibits;

2. Corliss Arnold dated 7/20/06 and attached exhibits;

3. Brett Immel dated September 12, 2006;

4. Declaration of Brett Immel dated August 15, 2006;

5. David Hollingshead dated September 14, 2006;

6. Chomie Neil dated September 8, 2006 and attached exhibits;

7. Mark Barry Elkins dated June 28, 2006 and all attached exhibits.

## Background on the Credit Industry and Terms

~~The plaintiff asserts that the defendants' actions have damaged his credit reports, credit scores, credit risk, and credit worthiness. He believes that the defendants' actions were inaccurate, misleading, harmful, and failed to assure the maximum possible accuracy when they prepared his reports to third parties both pre and post reinvestigation. In addition, he believes that the defendants' did not re-list his BK data or report the subject account as "*paid as agreed*" as requested. Based on the defendants' harmful activity, the plaintiff claims in his complaint and through my interview, that he has suffered *hardship* at the hands of the defendants'; I concur with many of the allegations in his complaint. This activity created financial hardship, frustration, loss of time, and other emotional consequences per my interview with the plaintiff.~~

~~As repeatedly found by Federal regulators, and confirmed by my experience, the banking system is dependent on fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of our banking system, and unfair credit reporting methods undermine public confidence. This is an essential element to our continued functioning banking system.~~

> **Comment [MSOffice15]:** Much of this just repeats the allegations of plaintiff's complaint; there is no foundation for this expert to testify about the soundness of the banking system.

*First*, the reporting of adverse tradelines (without the tradeline noted in bankruptcy) post bankruptcy discharge harms consumers of all types. *Second*, Equifax allowing their subscribers to re-insert previously deleted data does not keep our credit system in the eyes of Congress as the most reliable in the World. *Third*, failing to report accounts that are truly "*paid as agreed*" when in fact they are, harms both consumers and lenders. *Fourth*, showing major derogatory data post their filed bankruptcy is a *death sentence* in today's day and age of risk based pricing and automated underwriting.

### Nature & Purpose of Credit Reports

There is a large growing public awareness about the credit reporting industry, public awareness is by no means completely understood. According to a July 2003 survey by the

Consumer Federation of America[1], "Only 25 percent of Americans - and less than 20 percent of those with incomes below $35,000 - said they knew what their credit score was. But only three percent of Americans could, unprompted, name the three main credit bureaus Experian, Equifax, and Trans Union that provide both lenders and consumers with information from credit reports. Forty-three percent of Americans (35 percent of those with incomes below $35,000) said they had obtained a copy of their credit report from the three credit bureaus in the past two years."

Therefore, it is very important that the trier of fact have clear and accurate understanding of the nature and purpose of consumer reports, how to read and comprehend them and the secret industry that generates them. Accordingly, a brief description of a consumer credit report is fundamental to the trier of fact and in my opinion in this case.'

A consumer report, many times referred to as a credit report, contains highly sensitive and personal information, a compilation of a consumer's current and past credit relationships, their credit history/payment pattern, who they owe money to, and the amount, their employment history, estimated income and personal identifying information, such as name, address, phone numbers, drivers license number, spouses name, date of birth, and social security number (SSN).

There are three major repositories (data banks) known as credit bureaus or consumer reporting agencies (CRAs) Equifax, Trans Union and Experian. Repositories regularly receive updates on a consumer's credit relationships from their data furnishers also known as *members'*, which are banks, mortgage companies, debt collectors, credit card issuers, department stores and others. The consumer report typically contains highly sensitive and personal details about a consumer's finances, including account numbers, loan balances, credit limits and payment history. They also contain information on the consumer's interaction with the judicial system, including paid or unpaid civil judgments, paid or unpaid tax liens, or bankruptcies.

---

[1] http://www.consumerfed.org/072803creditscores.html

## A Credit Report consists of four basic sections:

### Identifying information/Demographic data:

(1) A section with the consumer's name, address, Social Security number, date of birth, previous address, employer, income, driver's license number, spouses names, and phone numbers.

### Payment History/Tradelines:

(2) A section with the consumer's pay history, including mortgage, auto and installment loans, credit cards and department store cards, and collections.

### Public Records:

(3) A section showing legal results, and public records like bankruptcies, Federal and state tax liens, divorces, and court judgments.

### Inquiries (hard):

(4) A section showing third party access with permissible purpose, in other words, those companies which accessed the report and for what legal purposes.

Credit grantors typically review a consumer's report and/or credit score when deciding to grant that consumer some form of credit. Credit furnishers review consumer reports and/or credit scores on current customers periodically (usually monthly or quarterly) to check on their credit worthiness and judge the furnishers *risk of loss*. This is known as an *"Account Review."* Credit card issuers regularly use partial consumer reports and credit scores to screen consumers for *"pre-approved"* credit offers. Some employers use consumer reports to evaluate employment applicant's eligibility in certain high end and financial industries. Some also use them to evaluate job advancement. Insurers also can use credit reports for underwriting purposes to *risk base price* consumers. Landlords also use credit reports for tenant screening.

**Credit Furnishers (Ocwen)**

A furnisher[2] of credit information as described under the FCRA § 623 [15 U.S.C. § 1681s-2] *Responsibilities of furnishers of information to consumer-reporting agencies*, after receiving notice from any consumer reporting agency of a dispute with regard to the completeness or accuracy of any information provided by a credit furnisher, the furnisher shall conduct a "*reasonable*" investigation[3] with respect to the disputed information; review all relevant information provided by the consumer reporting agency and/or the consumer; report the results of the investigation to the consumer reporting agency; and if the investigation reveals that the information is incomplete or inaccurate, the key word here is that Ocwen must find it to be inaccurate, and report those results to all consumer reporting agencies to which the credit furnisher reports their data.

Another mandated requirement of all data furnishers like Ocwen under both the FCRA and industry standards is that they report to all credit reporting agencies the "*date of first delinquency*" and the "*date of last activity*" in order to report their data on consumer credit files. All three repositories Experian, TransUnion, and Equifax require this and mandate this in their subscriber agreements. A data furnisher who furnishes information to a consumer reporting agency regarding a delinquent account being placed for collection, charged to profit or loss, or subjected to any similar action shall, not later than 90 days after furnishing the information, notify the credit reporting agency of the date of delinquency on the account, which shall be the month and year of the commencement of the delinquency on the account that immediately preceded the action. In other words, report the date a charged off or collection account *FIRST*

---

[2] A furnisher is any person who regularly and in the ordinary course of business furnishes information to one or more consumer reporting agencies about the person's transactions or experiences with any consumer.
[3] Linda Johnson vs. MBNA America 'affirmed" United States Court of Appeals for the 4th Circuit decided 02/11/04

went delinquent in which it never recovered or got current again. These dates control the credit reporting agencies ability to delete obsolete derogatory data that is past the FCRA's mandated 7-year statute of limitations.

If the completeness or accuracy of any information furnished by a data furnisher to any consumer reporting agency is *disputed* to the subject data furnisher by a consumer, the data furnisher may not furnish the information to any consumer reporting agency without reporting that the subject account as "*in dispute*".

A data furnisher who reports their data to a consumer reporting agency regarding a consumer who has a credit account shall notify the credit reporting agencies of the voluntary closure of the account by the consumer, in information regularly furnished for the period in which the account is closed.

**Experian and Equifax are National Credit Repositories (Data Banks). Responsible for Credit Reports their System sends through Affiliates, Resellers, and to other Third Parties**

Experian and Equifax are National Credit Repositories and are also national credit-reporting agencies[4] under the FCRA ' 603. [15 U.S.C. ' 1681a](f). They have chosen to report and sell consumer reports as defined by the FCRA '603 [15 U.S.C. ' 1681a](d). All three have always proudly admitted they are *Consumer Reporting Agencies*.

Almost every credit report is a consumer report, but not every consumer report is a credit report. A consumer report is merely any written communication that bears on the consumer's credit worthiness, character, credit capacity, etc. and given to a third party. Here, "*only*" Experian and Equifax have *compiled, assembled,* and *evaluated* credit information on the

---

[4] The term "*consumer reporting agency*" means any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.

plaintiff and have given *their private, exclusive,* and **trademarked** credit reports to their few remaining affiliates, resellers, and other third parties.

During the compiling of consumer data before and during the generation into Experian's proprietary database (*File One*) and Equifax's proprietary database (*Acro*) owned and operated exclusively by *only* Experian and Equifax. Before XPN and EFX generate their trademarked credit reports to third parties they must use "reasonable" procedures[5] to assure accuracy before they release a consumer report to "*any*" affiliate, reseller, or other third party.

Experian and Equifax themselves, within their databases, maintain personal information on almost every adult aged consumer in the country. They store such things as header data (name, address, and other non credit related personal information on a consumer), tradelines, inquiries, and public record data on consumers within a geographical area. In general, Equifax has the dominate file on the *East Coast* while Experian has the dominate file on the *West Coast*. This means that most lenders will use the *dominate file* (based on where the consumer lives) to determine a consumers eligibly for a loan. They store all information within what they both call your credit file. All subscribers/users including bureau *affiliates* and *resellers* pay a fee to access Experian and Equifax's credit databases even in affiliate areas. An inquiry is the legal name given for legal accesses by subscribers with permissible purpose[6]

*Only* Experian and Equifax (never their affiliates) upload electronically, tape, or manually the data tapes from credit furnishers across the country. *Only* Experian and Equifax (never their affiliates) determine what goes into a consumers credit file and what does not.

---

[5] *Accuracy of report.* Whenever a consumer-reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates.

[6] A consumer reporting agency may furnish a consumer report under the following circumstances and no other: (1) In response to the order of the court; (2) In accordance with the written instructions of the consumer to whom the report relates; (3) To a person which it has reason to believe (A) In connection with a credit transaction, (B) employment, underwriting of insurance, (D) eligibility for a license, (E) as a potential investor or servicer, (F) otherwise has a legitimate business need.

Almost always UDF's (universal data forms) and CDV's (consumer dispute verifications) are sent directly from the data furnisher to Experian in Allen, TX and to Equifax in Atlanta, GA. These are the forms mandated and controlled by both Experian and Equifax for their data furnishers to correct inaccuracies in consumers' credit files.

Experian has *two main* offices one is located in Orange county California and the other in *Allen*, Texas. The Allen, TX office is where consumers call and/or write their disputes directly to Experian regarding their credit issues, but based on my knowledge and belief the Orange, CA office also assists in a *limited* role with consumer disputes.

The department within XPN that handles consumer disputes is called *National Consumer Assistance Center (NCAC)*. The two main offices as described above perform mainly the following functions, but are not limited to the following *Costa Mesa*, CA (subscriber compliance Orange County, CA) and Allen, TX (consumer disputes). ~~TransUnion and Equifax began farming/outsourcing its consumer dispute processing services on all *Americans* overseas to countries like India, Costa Rica, Canada, and Philippians. I have to commend Experian for not following the other repositories lead by moving their consumer relations departments overseas in favor of *cheaper* employees who are *less* qualified and who cost *less* money plus they would have *less regulatory compliance* demands versus if they were located in the United States.~~

Equifax has *numerous* offices for handling all consumer disputes based on my knowledge and belief. These numerous offices are where consumers call, write, and where Equifax and/or third parties process consumer disputes directly regarding a consumers credit issues. The department within EFX that handles consumer disputes is called *consumer care*. These numerous offices are located in Atlanta, GA, Florida, *Costa Rica*, and *Canada*, and in *Manila, Philippines*.

The two current *third party processing companies* are named ICT and Convergys and are located outside the United States.

~~Based on my knowledge and belief in 2002 EFX began farming/outsourcing its consumer disputes processing services on *Americans* overseas to a company called "*ACS*" located in *Jamaica*. That third party processing company has now been replaced by ICT and Convergys as stated above. In other words, our *personal, private, confidential,* and *financial* information is being serviced and processed in a foreign country where security is not priority #1. This information is processed by a majority of foreign born non American financial savvy people. I question paying *less* qualified people less money to get quality work. These people don't work in America or even know the American way of life. How can this assure better credit accuracy let alone assure maximum possible accuracy? In my opinion, this creates a huge *security, language, culture,* and *privacy* issue for all Americans.~~

~~In my opinion, Experian and Equifax have begun a self inflicted scare tactic on the accuracy of their consumer reports. They have done this through spin off companies like *consumerinfo.com, freecreditreport.com,* other spin offs, and numerous other third parties like myfico.com via the internet and through email. They are bombarding consumers via television, radio, email, and the internet with what I call scare tactics like "do you know who is looking at your credit report", "Your car and home have locks", "Your computer has a password", "Your money is kept in a bank", "Wouldn't you feel better knowing your credit is looked after by Credit Check?".~~

~~In my opinion, these tactics used by Experian and Equifax on helpless consumers are designed to do nothing but *scare* them into buying their products/services at a large fee. Congress knew that the credit industry might use unfair tactics to lure and capitalize on helpless~~

consumers so they capped the price a credit repository can charge a consumer for their report. Congress also requires a repository to "*FREE of Charge*" handle correcting a consumer's credit file, but scaring consumers into buying their products at above-valued rates versus the reliable benefit to the consumer more then *compensates both Equifax and Experian* for the cost of correcting the very large numbers of inaccurate credit files. Both Experian and Equifax have created a large *profit center/cash cow* for themselves selling these new products and services.[7]

The credit industry has now figured out a way to avoid many of the regulations under the FCRA by blaming others for their actions or they scare consumers into buying their products/services in today's day and age of Identity Theft the largest growing crime in America. This can be confirmed *in part* by a class action case filed against Experian in the Northern District of California case #C04-01463 HRL (Chuck Browning vs. Yahoo, Inc, Consumerinfo.com, and Experian North America, Inc.) and a similar class action case filed against Equifax Northern District of Georgia Atlanta Division case #1:04-CV-3400BBM (Robbie Hillis vs. Equifax and Fair Isaac).

The main claim in these cases is that defendants' Experian and Equifax have engaged in what the industry calls "*Credit Repair*". The parties, only in the Experian case, have now agreed to settle their claims, but that settlement has yet to be approved by the court. In addition, the case has not gone through the process of having objectors voice their opinions on the value of the settlement for the harmed consumers. In my opinion, the settlement value for consumers is truly very low and almost worthless.

Experian and Equifax's actions in these cases speak for themselves. All I can say is "*Look who's calling the kettle black*". Only Experian produces an alert list where Experian and

---

[7] WSJ article dated 3/15/06 "Extreme makeover Credit Bureaus, Often Feared, are now Selling Themselves as the Consumer's Best Friend

~~Experian alone claims to have caught other third parties engaging in *credit repair* and what Experian calls illegal activity. In the above case, Experian itself, has been caught "*Red Handed*" engaging in, what Experian has called, illegal activity "*Credit Repair*". In my opinion "*what's good for the goose is good enough for the gander*". While this settlement states that Experian doesn't admit to any wrongdoing; it is my opinion defendants usually don't pay this kind of settlement, 2.5 million dollars, if they truly did nothing wrong. In both the *Clark* and *Browning* class actions Experian stopped in part the bad activity while paying 7.5 million dollars. The Equifax case is still pending.~~

~~Equifax keeps its money-making operations here in the United States, but out sources its non-income (black hole) operations overseas in favor of *low-cost* and *lower-paid* employees. Equifax keeps another consumer disputes department within consumer-care here in the United States called "*Rapid Resolve*", which use to be called *Expedite*. Experian keeps another consumer disputes department within consumer/subscriber relations here in the United States called "*Quick Score*". These services deal with correcting errors in consumer credit reports for the purpose of obtaining higher credit scores; this is called "*Rescoring*". TU and EFX have been providing this service for years prior. Experian has just recently begun providing this service. In my opinion this is a *very profitable* department within consumer relations (XPN) and consumer care (EFX).~~

~~These departments charge as much as $25.00 per tradeline (sometimes more) for each and every error/inaccuracy that affects a consumer's credit-worthiness, credit reputation, credit scores, and a lenders risk based pricing decision.~~

~~In other words, if the consumer has an error in his/his credit file; like having a Sears account reported inaccurately this *artificially* increases a consumer's risk of default factors for~~

the lender, at the same time lowers a consumers credit score. Equifax and Experian (now) have created a "*BIG*" revenue stream for its self. They tell *resellers* they can't charge consumers directly or indirectly for rescoring services, but both Experian and Equifax charge these high fees knowing that these fees are getting passed onto the consumer indirectly. In a joint mortgage transaction this could create as much as $150.00 of additional income (profit) for both Experian and Equifax to correct one Sears account on a mortgage report.

This is alarming because the wholesale cost of the entire credit report is on average $1.50. Many large users even pay less than that and as little as .40 cents a file. Under the *FCRA* all consumer disputes are to be done by any repository "free" of charge. If a reseller charges $15.00 for a tri-merge report and the reseller is requested or required to "rescore" and Experian and Equifax charge the reseller an additional $300.00 someone needs to pay that fee? Both Experian and Equifax (while hiding their heads in the sand) know their fees are being passed on indirectly to the consumer many times via the broker, lender, or reseller.

The repositories don't care *who pays the fee*, just as long as *they get paid.* They think that by telling resellers not to charge the consumer *directly* or *indirectly* they have exonerated themselves and are complying with the FCRA. This is a "*smoke screen*" because the fees have to be paid by someone and who do the corrections benefit? The consumer, so they will pay the repositories over inflated fees or be suck paying higher fees and costs for the mortgage loan.

Experian and Equifax doesn't make it mandatory that data furnishers use *their*" Metro II reporting format. The two Metro reporting formats are the mandatory reporting formats that all three national repositories require their data furnisher to report their data in for acceptance into all three repositories databases. Repository affiliates have no say so or control over this policy. Based on knowledge and belief it's a 60 — 40 split in favor of Metro II versus the old outdated

~~problem-filled Metro format. Making Metro II format a mandatory reporting format would create a more accurate credit report on behalf of consumers, but all three repositories refuse to require the change to the new version, but only recommend the change to the newer version.~~

**Comment [MSOffice17]:** Agreed to by plaintiff

During the process of inquiries, a credit report is compiled based on name, address, and usually a social security number, but a social security number is not a requirement. All of the consumer's personal information and credit data is then picked out by *only* Experian and Equifax's proprietary software (affiliates truly have no hand in the process) and run through a system of limited check and balances. Then both the consumer's credit report and a credit score are born for that subscriber/user only.

Experian and Equifax's network stores billions of pieces of both personal and credit data. They both receive this directly or indirectly from their subscribers/furnishers via electronic media, tape, or manual means using either Metro or Metro II reporting formats. They both store all real time credit information on their active networks called *File One* (Experian) and *Acro* (Equifax). Bureau affiliates, resellers, and all other subscribers can access these networks directly or indirectly. Experian and Equifax *exclusively* control separately the access to their national networks acting as *gatekeepers* for all access to their data and/or credit information. Based on knowledge and belief after a repository delivers the report back to their subscriber/user, both the exact credit score and credit report is lost forever. I know of no way to recreate the exact score and exact copy of the credit report that they delivered to an end-user.

Experian and Equifax have *sole* control and discretion over their respective reinvestigation procedures, data deletion methods, audits, data suppression, retention periods, and quotas for re-investigations. The few remaining Experian and Equifax affiliates have *no* true

control over Experian and Equifax's software functions as named above including their merging and combining functions.

Experian and Equifax must both handle reinvestigations and follow reasonable procedures when preparing a consumer report to assure maximum possible accuracy of the information concerning the individual about whom the report relates. The software used for reinvestigations is owned, controlled, and serviced by Experian and Equifax. Equifax's reinvestigation software is called "*ACIS*" and Experian's software is called "*CAPS*".

## The Dispute Process: E-Oscar and CCNS using ACDV, CDV's, UDF's, and AUD's

The Consumer Data Industry Association ["CDIA"] in cooperation with Equifax, TransUnion, Experian, and Innovis, created a web-based system for handling consumer disputes between the repositories and their credit data furnishers. E-Oscar stands for Online Solution for Complete and Accurate Reporting. The repositories and furnishers generate consumer disputes or reinvestigations using Automated Consumer Dispute Verifications ["ACDV"] and Universal Data Forms ["UDF"]. CDIA has two networks, and they call the main active system E-Oscar. They are phasing out their old system they were using called G.E. Information Services Credit Community Network Service ["CCNS"].

These two forms of electronic communication between the repositories and their credit data furnishers are widely used practices under Metro II and are used during the consumer's dispute process. Industry states publicly these two forms use carefully focused dispute codes and comply with their Metro II data reporting. Often these codes fail to give a true and accurate picture on many consumers' actual disputes. Bulls-eye reports are now beginning to replace data furnishers UDF reports because they are more convenient and cost-effective. A simple inquiry

displays the current status on an account stored in the repositories database for which a data furnisher can make changes to the way in which they reported their data originally.

The process begins when the repository transmits electronically its ACDV to the data furnisher where they store it into what 1 call a mailbox and/or holding area. When the furnisher receives the ACDV from the initiating repository they process the consumer's dispute. The furnisher then returns the ACDV to the initiating repository. They send a copy to the other repositories and the repositories that the furnisher reports to for updating. Through both automated systems the repositories usually don't forward "all relevant information" or documents to their data furnishers when they have been supplied with that information from the consumer.

The main design of the systems was to speed up and automate the credit dispute process and to improve data quality. Nevertheless, often the system falls short and fails to assure maximum possible accuracy. In the process, the repository captures the disputed data from its own database, creates a snapshot picture, and this picture is presented to the data furnisher for verification. Each repository breaks down the consumer's detailed explanation and documentation into a two-digit number with predetermined codes like (i.e.,) "not his/hers, possible mixed file," and the list goes on. Data furnishers respond by checking their internal database only and rely on canned comments like "verified as reported, update, or delete".

All three National Credit Repositories Experian, TransUnion, and Equifax generate *fee* income from all of their subscribers who use their mandated E-Oscar system. The repositories subscribers are charged a fee for each consumer dispute generated through their system.

**Credit Scores: how they generally work**

By way of background, the mathematical credit score generated by Fair Isaac or other modelers is done on the fly. The code is based on credit data within the consumer's credit file at the time the credit grantor requested the credit file. The score and the adverse reason codes generated is based on a mathematical formula. This code looks at each individual tradeline, comment, inquiry, and public record within each of the repository databases and calculates a number/score. Today credit scoring is the preferential choice of lenders as it provides a quick way to grant or deny credit. Modelers design them typically, to rank the likelihood that an applicant will go ninety days delinquent on any consumer credit loan or account within the next two years generally.

The credit score gets points added for many positive items and gets points deducted for negative items. These negative items can be late payments, collections, inquiries, accounts listed in bankruptcy, charge offs, tax liens, foreclosures, and high balances on credit cards just to name a few.

The lending industry has many different types of credit scores on the market today. Many different vendors have created them, such as Fair Isaac, the three national repositories, credit grantors, and insurance companies. Lenders use two types of credit scores generally. First, many rely on generic credit scores based on an applicant's credit file. Second, custom and behavioral scores designed by lenders that use their own statistical analysis and data based on their present and past customers and on their own individual needs.

While each lender has different credit criteria, several basic rules of thumb in scoring apply too almost every credit-scoring model. Each version is different based on criteria set by each of the separate national repositories, Fair Isaac, credit grantors, and others in the mortgage

arena, primarily lenders have viewed Fico scores below 620 as too risky. This will cause the consumer to be denied credit, suffer sub-prime rates, or other adverse terms. Additionally, the consumer's past payment history is the largest factor considered by scoring models.

The Fico model credit score, which is used by 75 percent of lenders, is based entirely on information in a consumer's credit report. The scoring range for the Fico classic model is 300-850. The higher the credit score, the less risky the consumer is viewed by creditors. Consequently, consumers with the higher credit scores usually above 720 often can obtain the most favorable rates for mortgages, refinancing, personal and auto loans and auto and homeowners insurance. They also receive loans with less or zero down payments, and can have higher DTI ratios (debt to income ratios), and also often receive solicitations for the best quality credit cards. Conversely, the lower the score, the less favorable the rate and terms are for the consumer.

For example, on a $250,000 30-year, fixed-rate mortgage, a consumer with a 720 score might pay a 5.5% interest rate with a monthly payment of $1,419, while a consumer with a 619 score would pay an 8.5 0% rate with a monthly payment of $1,922. The difference in payment is $503 per month, or $6,036 per year, or $181, 021.00 over 30 years. Consumers having too low of a Fico score can be disqualified for most, if not all, loan programs and options for major credit transactions like real estate mortgages. Similarly, the existence of certain types of derogatory information in the credit report, including unpaid bills, or collections, can make the consumer a higher risk and ineligible for major credit.

Like the credit reporting industry, there is even lower public awareness about credit scoring. A September 2004 survey by Opinion Research Corporation Intl. sponsored by the

Consumer Federation of America (CFA)[8] and Providian Financial, a major credit card issuer, found that:

Few consumers know what constitutes a good score. Only 12% correctly identified the low 600s as the level below which they would be denied credit or have to pay a higher sub-prime rate. (One-third thought this level was the low 500s, and 30% said they didn't know.) And, only 13% correctly understand that scores above the low 700s usually qualify them for the lowest rates.

The Fair Isaac scoring models (also called generic credit scores) are the industry standards. Experian's Fico score is called a "Fair Isaac" score, TransUnion Fico score is called an "Empirica" score, and Equifax' s Fico score is called a "Beacon" score. On their website, www.myfico.com Fair Isaac discusses the five main categories that they use in their statistical model. The five areas and percentage of weight each area generally carries are:

> 1.P   ayment history - 35 percent
>
> 2.A   mounts owed- 30 percent
>
> 3.Lengt   h of credit history - 12 percent
>
> 4.New   credit - 10 percent
>
> 5. Types   of credit used - 10 percent

Behavioral scores are quite different and distinguished from generic and custom scores because they use only their current consumers. Behavioral scores are used to cross-sell products to existing borrowers. For example, a lender may use their own score, which they have generated from their mortgage portfolio. They then select borrowers for new offers like a new credit card, insurance, or any other product they may have. Another important use of behavioral scores is in

---

[8] http://www.consumerfed.org/092104creditscores.PDF

collecting delinquent accounts. Consumers with poor behavioral scores are contacted earlier than consumers with higher behavioral scores.

**Definition of Inaccuracy**

Inaccuracy as defined by industry standards and practices is, "**any**" misleading, incomplete, and/or outdated data, which fails to convey the full and true picture of the consumers credit risk, credit capacity, credit standing, credit reputation, credit worthiness, character, and personal characteristics.

In today's day and age of credit scoring (multiple modelers and versions), risk based pricing, based on a lenders risk of loss factors, and AU (automated underwriting) systems having *true* accuracy is more important and critical then ever before for lenders, credit grantors, and most importantly consumers based on today's risk based credit system.

**Summary of Findings and Basis of Opinions**

All defendants' have *truly* harmed the plaintiff in this case. It is my opinion that defendants' Equifax and Experian have acknowledged their liability in this case as I have already described by finally updating the subject Ocwen account, but only **three (3) years** after he began his long dispute process. Ocwen did not handle their responsibility as a data furnisher, they did not follow the standard of care within the industry and accurately report the fact that the plaintiffs account was "*paid as agreed*" during his bankruptcy and NEVER late. Equifax and Experian did not handle their responsibilities as national credit repositories, they did not follow the standard of care within the industry, and they didn't re-list and mark the subject account as "*paid as agreed*" with no late pays. Clearly Equifax and Experian were on notice as far back as 2003 if not earlier.

---

**Comment [MSOffice18]:** Delete bold.

**Comment [MSOffice19]:** Delete caps.

At this point I am convinced that all defendants' have conducted sub par, inadequate, and used substandard procedures when credit reports were produced and sent to third parties. This was after the plaintiff exercised his rights to have an investigation/reinvestigation post his numerous disputes. Based on my review of the discovery from all the defendants' and their industry practices it is my opinion that they all failed their duties as a data furnisher and credit reporting agencies and used *inadequate* and/or showed a lack of *quality control procedures* when credit reports were produced to third parties.

The plaintiff sued a single data furnisher Ocwen and two credit repositories Equifax and Experian and he asserts that information reported by these defendants' has created damage to his credit report, credit score, and credit reputation. The FCRA requires consumer reporting agencies to use "reasonable" procedures to assure maximum possible accuracy before they produce reports to third parties. It also requires all defendants' to conduct a "reasonable" investigation/reinvestigation after a consumer puts them on notice of their dispute. This dispute between the plaintiff and the defendants' regarding the subject account with Ocwen has at least over a **three** year track record if not longer based only on the FCRA's statute of limitations.

All these actions listed above have created additional credit damage, lower credit scores, much lower credit worthiness, a lower credit reputation, and a higher risk for the lenders he applied with. The plaintiff chose to reduce his credit applications based on his embarrassment, heartache, and his stress level.

I reviewed the consumer's disclosures, loan applications, and other relevant materials supplied to me in this case. After reviewing this material, it is my opinion that all the defendants' caused *harm* to the plaintiff. His lack of loan mortgage programs and options, lack of new credit,

**Comment [MSOffice20]:** There is no basis in the record for this expert to testify about Ocwen's general procedures. See Memorandum Opinion and Order.

**Comment [MSOffice21]:** Mr. LeFerbre is not a legal expert. It is not appropriate for him to opine on what is required by the FCRA. See Memorandum Opinion and Order for details.

**Comment [MSOffice22]:** Not an expert on emotional distress issues.

~~and financial damages including~~ *tremendous* ~~frustration were the result of the defendants'~~ ~~misconduct~~.

~~I find that plaintiff's factual allegations in his complaint provide quite an accurate~~ ~~overview of the defendants' actions. All these actions caused the plaintiff additional credit~~ ~~damages, humiliation, embarrassment, out of pocket expenses, and other emotional damages. In~~ ~~addition~~ The actions of the defendants' affect a lender's ability to judge the plaintiff's true overall risk and their risk of loss factors especially since the plaintiff was in a bankruptcy score card, which on its face created at least a 3/8 to 1/2 point increase in his rates. This harmed the plaintiff as described and also harmed the lenders who lost the opportunity to provide their services to a qualified applicant at better rates and terms.

I noted that a number of credit grantors and current creditors viewed the plaintiff's credit file based on the credit reports and consumer disclosures that I reviewed. These reports bore the false reporting as I have already described. I reviewed the plaintiff's loan packages and underwriting decision notices, which were in my opinion adverse actions. I analyzed the plaintiff's overall credit reports and credit scores, which both are consistent with lack of re-listing and marking the subject account as "*paid as agreed*" and on time with no late pays that is the subject of this litigation. This factor played as a *major* substantial factor in the plaintiff's adverse actions and his reluctance to pursue new credit. I state the following opinions to a reasonable degree of credit certainty as to all the defendants' conduct in this case:

**Opinion No. 1**

> ~~In every aspect of their misconduct,~~ *Ocwen did not handle their responsibilities as a data furnisher* ~~by using good sound procedures and judgments~~ *in their investigations after the*

*plaintiff's numerous disputes directly and indirectly through numerous credit reporting agencies.*

It is my opinion, within a reasonable degree of credit and lending certainty that the procedures used by the defendant Ocwen after the plaintiffs re-investigation process were *not adequate* and *not dependable* based on industry practices. ~~They were also~~ *~~insufficient, unreliable,r eckless,subs tandard,~~* ~~and well~~ *~~below par~~* ~~based on the facts presented for my review in this case.~~

~~Ocwen's own evidence, discovery, and depositions clearly show that Ocwen knew they were dealing with their own internal re-aging of the plaintiff's~~ *~~"paid as agreed"~~* ~~account. This means in my opinion that~~ Ocwen had no right to re-report their ~~re-aged~~ derogatory tradeline post the plaintiff's direct dispute to Ocwen.

~~Employees for Ocwen seem to contradict themselves throughout their depositions. There seems to be massive chaos within Ocwen on how they should report the plaintiff's account since they couldn't figure out their own re-aging issues.~~

~~In my many years of dealing with almost every credit furnisher across the country including Ocwen and thousands of others, I have seen first hand, their lack of quality standards by some within the industry. During our many reinvestigation disputes over the years I witnessed first hand with Ocwen many times, and in other cases where I was retained as an expert, and again here, that they have shown a pattern and practice of substandard procedures compared to other data furnishers across the country based on my experience.~~

~~I have been offended over the years when I dealt with unfounded comments by employees of Ocwen who were working on our reinvestigations. These employees seem to be qualified in lending, but had no clue about their responsibility during our reinvestigations.~~

Comment [MSOffice23]: This is argumentative and is opining on the issue of willfulness—these are legal conclusions

~~Congress clearly mandated that all parties must assure maximum possible accuracy using reasonable procedures. In my experience with Ocwen they blocked in most cases our ability to get at the truth in order for us to assure true accuracy, which we were required to do under the FCRA. In many cases based on this attitude we deleted their tradeline since they were unwilling to assist, were very uncooperative, unaccommodating, and in our opinion they were unable to verify which then required us to delete under the FCRA.~~

~~My opinion is that many at Ocwen believe *close enough is good enough*, but that only counts in horse shoes and hand grenades not for data furnisher compliance with the FCRA. I have seen this attitude many times, which then creates my opinion, and again in this case, that many Ocwen employee's and management are not properly trained in the true nature of the FCRA regarding re-aging, which then leads to improper knowledge on how to correctly fill out the credit industries UDF's ("universal data forms") and CDV's ("consumer dispute verification forms"). My opinion is that the FCRA requires a *much higher quality of investigation* after a~~ known re-aging and accuracy issue and the consumer disputes to a credit reporting agency a data furnishers monthly reporting.

**Comment [MSOffice24]:** Agreed to by plaintiff.

The plaintiff's first confirmed bureau dispute based *only* on the discovery in this case was via Equifax in June of 2003[9]. I have not been presented any real Ocwen discovery in this case, which may or may not show a different picture. In addition, there is a difference in the total number of disputes the plaintiff had under the FCRA and privately with Ocwen over numerous years.

The discovery clearly shows the inconsistent reporting by Ocwen to numerous credit reporting agencies over a period of almost three years. In other words, these below ratings flipped flopped back and fourth over the years post the plaintiff's dispute process.

---

[9] EFX discovery Bates stamps EIS-Eilkins-0001-0007 and Plaintiff's Elkins 000896

1. **Charge off**

2. **Paid Charge Off**

3. **Discharged through BK**

4. **Settled for less than full value**

5. **Paid as Agreed**

Ocwen did significantly lower and downgrade the plaintiff's credit scores, credit reputation, and credit worthiness and at the same time increased any new lenders risk of loss factors. Ocwen reported the following post reinvestigation based on a combination of subscriber reports and the plaintiff's consumer disclosures as listed below:

**June/2003 — EFX Frozen Scan**

| Acct Name/Number | | | | Bureau Reporting | | | Past Due | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Type | Open | High | Pymt | Balance | MOP | Status | Rptd | 30 | 60 | 90+ | MR DLA |
| **Ocwen Federal** | | 3684289 | | | EFX | | | | | | |
| J | 08/98 | $95000 | $360 | $0 | | 19 PD chrg off 6/03 | | | | | 10/99 |
| **PAID CHARGE OFF** | | | | | | | | | | | |

**June/2005 — EFX Consumer Disclosure**

| Acct Name/Number | | | | Bureau Reporting | | | Past Due | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Type | Open | High | Pymt | Balance | MOP | Status | Rptd | 30 | 60 | 90+ | MR DLA |
| **Ocwen Federal** | | 368* | | | EFX | | 02/05 | | | | |
| J | 08/98 | $94500 | $1063 | $0 | | 17 Wage Earner Plan | | | | | 10/99 |
| **Involved in Chapter 13 Debt Adjustment — SETTLEMENT ACCEPTED ON THIS ACCOUNT** | | | | | | | | | | | |

**June/2003 — XPN disclosure Report**

| Acct Name/Number | | | | Bureau Reporting | | | Past Due | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Type | Open | High | Pymt | Balance | MOP | Status | Rptd | 30 | 60 | 90+ | MR DLA |
| **Ocwen Federal** | | 368.... | | | XPN | | 10/99 | | | | |
| J | 08/98 | $94500 | | $0 | | 17 Chapter 13 | | | | | 09/01 |
| **DISCHARGED THROUGH BANKRUPTCY CHAPTER 13- REAGED (my opinion)** | | | | | | | | | | | |

Daily conversations with CRA's, other lenders, CDIA, training by the three repositories at startup and continuing education, and similar employees of other bureau subscribers should have educated Ocwen's management, employees, and collection staff to the importance and requirement in reporting *accurate* and *consistent* credit information at all times. ~~Clearly Ocwen reports in a *reckless* nature when a consumer is a victim of Ocwen's re-aging problems, they also handle investigations in a *reckless* nature, they show no quality control~~

~~standards, and their data can't be trusted as it relates to this plaintiff, and they surely can't assure~~

~~accuracy.~~

~~Proper training of one's employees, monthly/quarterly management reports on important~~

~~issues, and follow-up communication with employees and management on problem issues, will~~

~~often assist in creating a good foundation that will lead to a reliable standard of care that can be~~

~~followed and practiced. Ocwen failed in my opinion to properly train their employees and~~

~~management from which a reliable standard can be followed to assure credit accuracy.~~

## ACDV #1 — Response (by OCWEN) via XPN date 10/2003

| Request Data: | | Response Data: |
|---|---|---|
| Name: Mark B. Elkins | (S) | Name: |
| AKA: | (U) | AKA: |
| Addr: 1816 Whitney Dr. Hanover Park, IL 60133 | (S) | Addr: |
| Prey Name: | (U) | Prey Name: |
| Prey Address : | (U) | Prey Address: |
| SSN: 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 | (S) | SSN: |
| DOB: 1964 | (S) | DOB: |

Consumer   *I have a payment history and a letter confirming this from Ocwen*
 States
Comments
FCRA Relevant Information:

| Subscriber Name | Sub. Code | Opened | Rpt'd | Bal. Owing | Past Due | High Credit | Payment | Acct Tp | STATUS/MOP |
|---|---|---|---|---|---|---|---|---|---|
| Account Number | Credit Limit | Terms/Pay | | Last Pymt | DT 1st Del | Activity D | History | | decode |
| Type Loan | Collateral | | | SP.Comments/status/Remarks | Closed | | chrg off Amt | Pay Rate | ECOA |
| *Ocwen federal* | 6107530 | 1998 | 10/99 | | | | | | 09 |
| 19700105529500001 | | | | **BKJ3DISC** | | 10/99 | | | **BKREPT** |
| *Discharged through Bankruptcy Chapter 7* | | | | | | | | | J |

| | | | | | | |
|---|---|---|---|---|---|---|
| Change | | | 09/03 | | **CURR ACCT** | |
| Data As | x | | | **CURR ACCT** | | 09/03 |
| Shown: | | | | Bankruptcy Ch 13 field 10-8-99 Loan Paid Off/CHARGED OFF 1-25-02 | | |
| Response Codes: **02 Modify As Shown** | | | | | | |
| Consumer Message: | | | | | | |
| Authorized Phone/Name: | | | | | | |

Based on my knowledge and belief, the ~~re-aging~~ *mistakes* were pointed out to Ocwen

before and after numerous FCRA disputes by the plaintiff. ~~and through the filing of this~~

~~litigation.~~ I have reached the conclusion based on limited discovery that the total of actual

disputes is *six* (6) based on my review of the discovery. The ~~plaintiff claims more disputes that~~

~~were done verbally, but only further discovery will prove that claim.~~

~~Ocwen's discovery in this case clearly shows me that they don't have true *adequate*~~
~~procedures in place for performing an *adequate* investigation and to avoid the same mistake from~~
~~happening over and over again. Plus no *adequate* procedure in place for correcting the injustice~~
~~Ocwen has done to this plaintiffs credit reports and other victims of their re-aging problems.~~
~~They truly have no red flag system for anyone at Ocwen to follow, short of the consumer~~
~~contacting Ocwen and hoping they will fix their *mistakes*, but as this case clearly shows that did~~
~~not happen. Clearly Ocwen did not *fix* their own internal *failures* even though the plaintiff went~~
~~*way* beyond what the FCRA requires and still had no success against, in my opinion, a "*bully in*~~
~~*the industry*" so the plaintiffs *hopes* were crushed.~~ Ocwen also reinserted their inaccurate data
after Equifax had previously deleted Ocwen's account in July of 2003.

~~Quality trained employees, training, and an adequate standards policy is not in the~~
~~forefront of Ocwen's management. Consumers can't force change, higher standards, *adequate*~~
~~procedures, and data furnishers like Ocwen to follow industry standards. The plaintiff's only~~
~~option after numerous disputes to Ocwen, the credit reporting agencies, is to exercise his legal~~
~~rights as given by Congress and file suit and hope that will bring about change in the form of~~
~~accurate reporting. So the plaintiff in this case is just another victim of a very *obvious* problem,~~
~~erroneous reporting of re-aged derogatory data. The credit reporting agencies and Congress tried~~
~~to correct this, but this furnisher *Ocwen* seems to think those rules don't apply to them.~~

~~In the credit industry, there is a saying/expression used daily to describe this lack of~~
~~communication as I see here within Ocwen and between Ocwen's departments "*The right hand*~~
~~*does not know what the left hand is doing*". I'll go one step further by saying "*Ocwen 's attitude*~~
~~*in this case seems to point out that the rules, industry standards, and that the law doesn't apply*~~
~~*to them*". That attitude is most evident in this case. In this case it can be surely used for the credit~~

disputes department, the department that handles application processing, and the management teams within Ocwen.

The burden of proof (as set by industry standards) falls directly on the defendant Ocwen and their actions, in this case, as set by industry practice regarding re-aging issues. The FCRA requires reasonableness during the reporting of credit data, and then puts a higher standard on all parties *including data furnishers* after the consumer disputes. In my opinion, when a consumer makes a claim of re-aging and inaccurate reporting there is even a *higher* quality of care required. This case clearly crossed the line on reasonableness, when the plaintiff submitted and brought to their attention their own re-aging problems that allowed inaccurate derogatory reporting to harm the plaintiff when [that] the subject account was in reality "paid as agreed" and on time.

In the credit, lending, and furnisher industries sometimes, only a piece of paper, pencil, a good old sense of fairness and common sense must apply. The credit industry is usually not the trier of fact. However, when the consumer disputes the data furnisher's reporting to credit reporting agencies because of re-aging issues, contests the accuracy of the reporting, and contests that the debt was paid as agreed and on time, then the lender/furnisher who has the original signed application, pay history, and other relevant information, must work with the repositories to correct the erroneous reporting to stop the harmful activity against the consumer who's life could be ruined by their failures.

We cannot always think, *"CONSUMERS ARE LIARS"* in every transaction when they exercise their rights regarding disputed information and claiming that they are a victim of re-aging problems and inaccurate reporting. This kind of problem engaged in by a few data furnishers creates damage to our credit system. It creates inaccurate credit reports for others who

are looking to lend their resources to others who as in this case truly deserve their products at the best rates and terms. Data furnishers like Ocwen must fulfill their obligations to protect consumers in today's day and age of ID theft, automation, and risk-based pricing. Since the cost of correcting the issue was far less than the cost and damage done to the plaintiff in this case.

A requirement that the credit industry has and requires of their data furnishers/subscribers includes, but is not limited to, the following:

I.  Adequate training post account setup on the impact of inaccurate credit information;

II.  Providing employees with written procedures about handling consumer dispute investigations;

III.  Adequate training on the industries use of UDF's and CDV's;

IV.  A check and balance system in place for reporting credit issues that may cause an inaccuracy for numerous consumers;

V.  Set up and test a method periodically for accurately reporting their accounts;

VI.  Educate ALL employees about known problems, to prevent reoccurrences;

VII.  Educate their subscribers on how re-aging would lead to inaccurate reporting.

**Opinion No. 2**

*Equifax and Experian uniformly did not assure adequate accuracy as it relates to the standard of care within the industry when they prepared the plaint reports to third parties creating false indicative factors*

**Equifax and Experian's procedures during dissemination to third parties:**

It is my opinion defendant Equifax and Experian engaged in an identical pattern and practice before and after the plaintiff brought all the above issues to their attention over a period of 3 years. In addition, after the plaintiff requested numerous times to reinvestigate the subject Ocwen tradeline and they refused to re-list and then EFX reinserted the subject account back in the plaintiff's credit file without proper notice. Most consumers don't completely understand how the credit industry truly works and what can and can't be reported on their credit files. Most consumers that are well educated including most professionals have a hard time with this issue.

Proper training of one's employees, monthly/quarterly management reports on important issues, and follow-up communication with employees and management on problem issues, will often assist in creating a good foundation that will lead to a reasonable standard of care that can be followed and practiced. Equifax and Experian failed in my opinion to properly train their employees and management from which a reasonable standard can be followed to assure true credit accuracy and avoid their lack of re-listing bankrupt accounts.

Based on my knowledge and belief, these types of *problems* were pointed out to both Equifax and Experian over the years by the plaintiff. Equifax and Experian have no true *reliable* and *adequate* procedure in place to avoid the same mistake from happening again and again. They truly have no red flag system in place for anyone to follow; short of consumers filing lawsuits which then many times cause them, in my opinion, to create and use good sound procedures. So the plaintiff in this case is just another victim of a well known problem regarding re-listing of bankrupt accounts that were actually "paid as agreed" both pre and post discharge within Equifax and Experian's databases.

The plaintiff Mark Elkins through his legal counsel contends that the issuance of a credit report with a bankrupt tradeline that was actually "paid as agreed" and not delinquent, is inaccurate and a violation of the FCRA. I concur with that position.

Whenever a consumer reporting agency prepares a consumer report they will follow reasonable procedures to assure *maximum* possible accuracy, as required under the FCRA, of the information on the individual about whom the report relates. Webster's on-line dictionary defines maximum as follows:

> *"The greatest or most complete or best possible;*
> *The largest possible quantity; The greatest possible*
> *degree; "he tried his utmost"."*

The clear reading of Webster's definition in my opinion backs my opinion regarding both Equifax and Experian's efforts when they disseminated their reports to third parties in this case. Clearly Equifax and to a lesser degree Experian didn't try their "*utmost*" because if they did they would have marked the subject account as "paid as agreed", but only did so after being sued in this case.

The practice of reporting verified non *re-listed* tradelines when they were actually paid as agreed, after the consumer disputes the accuracy on an account, and the furnisher continues to validate the inaccuracy establishes that the CRA and furnisher have failed to assure accuracy. This shows a noncompliance with the FCRA and suggests that all defendants' have no reliable procedures in place for this type of dispute to protect consumers against such manipulating of the system by all the defendants'.

**CRA's are truly fact finders when they see two conflicting main issues as we have in this case:**

First, Equifax and Experian had knowledge and knew that they could not trust the data coming from Ocwen before the reinvestigation process began in 2003. Was it reasonable for them to ignore all the previous facts showing that the plaintiff's subject account had been "paid as agreed" and report the major derogatory account anyway? It is my opinion **no**.

Second, Equifax and Experian's own discovery clearly shows that the Ocwen account was paid on time and this was brought to their attention by their own subscriber. So, was it reasonable to allow the plaintiffs major derogatory non re listed account to re-report along with the *false* account history anyway? It is my opinion **no**.

**Opinion No. 3**

*In every aspect of their misconduct EFX and XPN un4formly did not perform acceptable reinvestigations as it relates to the standard of care. Equifax's lack of seeing all warning signs and their use of substandard procedures, directly caused injury to the plaintiff*

It is my opinion within a reasonable degree of credit certainty that the reinvestigation procedures during the plaintiff's dispute process were well below par, inadequate, and substandard regarding the numerous creditors. In other words, a reinvestigation must be a *good faith effort* to determine the accuracy of the disputed items to assure accuracy. Equifax and Experian have not provided any discovery to show otherwise or contradict my opinion. In fact Equifax's own discovery backs my opinion in this case. The plaintiff had six (6) requests for reinvestigations from 2003 through 2006 based on my review of the discovery, but there is a question into the total number of disputes created by the plaintiff.

The minute the plaintiff notified Equifax and Experian that he was exercising his rights under the FCRA's reinvestigation procedure; that then raised the standard for both Equifax and

Experian, which changed the standard of care to a much *higher* level to assure true accuracy. Both Equifax and Experian did not explain in detail the plaintiff's dispute to the plaintiff's creditors including Ocwen. In fact, the limited ACDV's (Equifax has not provided any ACDV's in this case) showed a lack of a real attempt to explain the plaintiffs well done and documented dispute. In addition, EFX and XPN never provided the plaintiff's documents to any of their subscribers that would have explained in detail the plaintiff's claims; Both EFX and XPN never do in their reinvestigations and clearly, in my opinion, this may be a FCRA violation. These documents were critical in this case and in other words they were the smoking gun that clearly established the plaintiff's position regarding the plaintiffs re-listing issue and paying his account "as agreed" both pre and during his bankruptcy.

The plaintiff was *very* clear in his verbal and disputes which included submitted documentation. It looks to me that Equifax did NOT accept the plaintiff's documents as *acceptable documentation*. Most of the plaintiff's requests of Equifax and Experian were only to mark the subject account as "paid as agreed" and not late. Both EFX and XPN both reported the subject account at sometime as charged off, paid charge off, settled, or discharged through his bankruptcy all of which were *false*.

In my opinion, Equifax and Experian failed their duties as National Credit Repositories. Close enough is not good enough for compliance under the FCRA. This in my opinion is *reckless* because they were given evidence by the plaintiff and by their own subscriber and they *blew it off* and re-reported derogatory data they knew was "paid as agreed". It is my understanding that both Equifax and Experian claims to have conducted reasonable re investigations into all of the plaintiff's disputes, but I have to strongly disagree. These actions by Equifax and Experian created *major harm* and *damage* for this Plaintiff.

It is my opinion, all Equifax and Experian did was just the bare bones minimums on their reinvestigations during the long dispute process from 2003 through 2006; but after being sued they, in my opinion, raised the quality of their reinvestigation and finally marked the subject account as "paid as agreed" with no late pay history.

I cannot again overemphasize the human factor, including human intervention, needed during some consumer disputes; based on my experience of handling thousands of consumer disputes, both major and minor. Equifax and Experian become the triers of fact on all credit issues when they have conflicting data coming from the consumer and a credit furnisher; especially when they have knowledge of a defect within their system that negatively harms consumers and does not give a true and accurate picture of a consumer's credit reputation, risk, and credit worthiness. This defect is called re-aging; a widely known problem within the credit industry.

### Opinion No. 4

*Defendants' misconduct directly caused injury to the plaintiff as it relates to the standard of care within the credit industry.*

### Adverse Actions/Denials

The following opinions I express here come from my personal knowledge I obtained through review, study of professional journals, government studies, my past ownership of a CRA, our past rescoring services, our AAA credit score, my past co-ownership of an escrow company, my managing a mortgage office, and loan officer dealing with lenders, both wholesale and retail, and my professional experiences as a CRA dealing with lenders and credit card vendors across the country. It is my opinion, to a reasonable degree of credit certainty; the

plaintiff would have received limited credit denials even based on an *error* free and accurate credit report. His past bankruptcy would have played a factor in that.

~~In my opinion, the reason the plaintiff received his adverse actions and credit denials were based in part on the defendants' actions in this case. The adverse actions were due to the defendants' failures based on industry standards and under the FCRA. These failures misled lenders into believing the plaintiff was no longer trustworthy and they judged him as a much *higher* credit risk. The defendants' actions led Countrywide Mortgage in part into taking *adverse action* against the plaintiff on his seven home loans. Based on my understanding these properties were the following:~~

~~1.    138 W. Marilyn~~

~~2.    1127 Brentwood~~

~~3.    1319 Parmele~~

~~4.    1816 Whitney~~

~~5.    2711 W. 97th~~

~~6.    5758 S. LaSalle~~

~~7.    10020 Country Club~~

~~The plaintiff stated to me that he was so embarrassed and humiliated that he didn't want to apply for new credit until it was corrected or resolved legally unless it was extremely unavoidable.~~

In my reading of the deposition and declaration of Britt Immel I must slightly disagree with all of his opinions as stated. While Mark Elkins would have paid a higher rate for his mortgages based on his bankruptcy, non-owner occupied status, the main factor he was charged higher rates and terms was clearly based on the fact that Ocwen reported derogatory history post

his discharged bankruptcy. Based on my interview with Britt Immel of A & N Mortgage Services the plaintiff is paying about *3/8 to 1/2 point higher* on his rates (7 mortgages) based on the inaccurate reporting by Ocwen post the plaintiff's bankruptcy discharge. Most lenders that I know of would believe that the plaintiff was headed "again" down the wrong track with this Ocwen tradeline showing derogatory history post bankruptcy. Derogatory history post bankruptcy is a *major* factor in determining a lenders risk of default factors. I would like to see the Countrywide's automated underwriting determination report called their "Clues" report before I calculate the interest rate difference contributable to the defendants' as a result of their failures.

~~The plaintiff also indicates to me that he was also declined for numerous credit cards and lines of credit during the same time period that the Ocwen account was reporting not "*paid as agreed*". The following accounts are credit denials that the plaintiff claims he was turned down for:~~

        ~~1.~~   ~~Juniper~~

        ~~2.~~   ~~Discover~~

        ~~3.~~   ~~B of A~~

        ~~4.~~   ~~Chase~~
        ~~5.~~   ~~1st Equity*~~

        ~~6.~~   ~~Washington Mutual *~~

~~I am not able at this time to match up some of the plaintiffs denials with credit accesses by some of the above credit grantors, but at the time of inquiry the Ocwen account would have played as a major factor in those credit decisions. I would need further discovery in order to back or deny the plaintiff's position regarding these credit denials.~~

**Credit Worthiness**

I have reviewed and considered whether the incorrect reporting of the Ocwen account, reported post bankruptcy as *charged off* as a *paid charge off, settled for less than full value*, or *discharged through bankruptcy*, negatively impacted the plaintiffs credit history, credit worthiness, credit standing, character, general reputation, and was the major factor in his adverse actions. The answer is an emphatic **yes**.

In today's information superhighway of automated evaluations, automated underwriting of insurance and mortgages these systems live and die on the use of credit scoring. The higher the credit scores the better the rates and terms. An account reported as *charged off* or *settled* and not re-listed is a death sentence when it comes to obtaining new credit if done post bankruptcy. Often, a point up or down could be the difference in getting your application accepted or rejected. Often it could be the difference between a prime or sub-prime loan, accept or a preferred mortgage, preferred or mid-market auto and homeowners insurance, getting a special employment license, and even getting a job.

I see a clear-cut link between the actions of the defendants' as it relates to the plaintiff's *damages* before and after the dispute process began. The *inaccurate* Ocwen account, reported by the defendants' directly to their third party subscribers, was the *major* factor in lowering the plaintiffs credit capacity, credit scores, credit reputation, and overall credit worthiness. These actions caused the plaintiff to appear as a much *higher* credit risk and possibly a *deadbeat* to most new lenders he applied with.

Decisions to deny credit, raise rates, lower credit lines *might* have more than one cause and usually do. For example, often the inaccurate, misleading, or incomplete information and another factor can each, considered separately, be insufficient to have caused the denial of credit,

but when taken together are sufficient. Therefore then, each would be considered a substantial factor in bringing about the denial of credit or other adverse actions. The Ocwen account reported by Equifax and Experian in this case *in part* was a *major factor* in the plaintiff's mortgage adverse actions and other credit denials.

It is reasonable to conclude that since lenders use credit scoring, calculate their own proprietary scores based on a consumers overall credit worthiness, in conjunction with calculating a consumer's debt to income ratios, having an accurate credit report is critical. Having an account reported as *charged off or settled* after a bankruptcy would and did lead most automated lenders and automated underwriting systems that I know of to believe that the plaintiff was a really bad credit risk and a person whom they should avoid and not do business with.

There are five major parts to every mortgage loan: (1) income, (2) collateral, (3) credit, (4) down payment, and now (5) credit scores, all working in conjunction together on a sliding scale, based on credit scores and credit worthiness.

### Opinion No. 5

*In every aspect of their misconduct all of the defendants' un violated the plaintiff's rights to credit privacy as it relates to the standard of care within the credit industry harming the plaint ( credit reputation and credit worthiness*

### Credit Privacy

Today credibility is measured, and often sustained or destroyed by a consumer's credit report and scores. Whether people will develop a feeling of trust, which is a needed ingredient in hiring people, granting credit, getting utilities, or getting an insurance policy often depends on a report based on your credit performance, credit reputation, character, and their overall general reputation. Because of this reflection of a person's integrity and character, accuracy of all

information reported to a credit repository by its data furnishers is *paramount*. Decision makers have said, and lenders that I did business with have stated, "What is past behavior is confirmation of a person's commitment-keeping ability before, and thus glance conceivably into their future paying habits."

The defendants' had enough evidence, warnings, and bells and whistles going off that they should have erred on the side of caution and should have used good sound judgment by stopping and *deleting* the account history reported by Ocwen as *charged off or settled* or at lease re-listing as included in bankruptcy with no derogatory history. There is a pattern and practice called re-listing, which is unknown to consumers, and has been going on for many years within industry.

Inaccurate, misleading, and harmful tradelines of this importance and magnitude will cause extreme consequences, both short-term and long-term. Which will inconvenience and increase consumer costs of necessities and other expenses that people will normally incur and need. Inconvenience can take the form of automated credit denials and/or other adverse actions as we have here, resulting in a lack of money, or the lack of essential goods and services, when needed the most. An excellent example of essential goods and services is a consumer's ability to rent an apartment, buy a home, get insurance, employment, buy a car, and obtaining utilities. These processes weigh heavily on information contained in a consumer's credit file.

As I have seen in my years in both the credit and lending business, and as shown in industry reports, a good credit reputation and acceptable credit score are not birth rights. Often, it is a frustrating on going and sometimes full time job as we see in this case when the defendants' knew or should have known that the Plaintiff 's Ocwen account needed to be re-listed and shown as "*paid as agreed*". The system put into place by Congress to protect consumers against this

kind of activity failed only because of the conduct by the defendants' and their lack of good sound procedures, substandard care, and lack of good sound follow through before they disseminated the plaintiff's reports to third parties.

~~Opinion No. 6~~

*~~Plaintiff has suffered substantial ongoing damages from the actions of the defendants'~~*

~~In my years working in the real estate industry dealing directly with consumers by handling their disputes, hearing their credit war stories, and problems with their credit files, I have found that many consumers rate the dispute process regarding bankruptcy accounts up there among their least favorite things to do in life and impossible to correct as in this case. When a data furnisher purposely or mistakenly reports an account as unlisted and Equifax and Experian refuses to *re-list* and show the subject account as "paid-as-agreed" consumers become very frustrated and angry. As in this case it is very hard to prove that you are not a *liar* and not a *deadbeat* when the defendants' keep implying that you are to third parties.~~

~~**Impact on Plaintiff**~~

~~In this sense, the quantitative is qualitative. Day after day, week after week, month after month, and year after year (in this case over three years) the plaintiff had to invest hours upon hours of his time and energy in an attempt to restore his good name and reputation, but he was never totally successful. The plaintiff had to endure seeing himself looked at by most lenders, his current creditors, and others as a *deadbeat*. In my interview with the plaintiff he stated the following:~~

> ~~"I am humiliated and embarrassed because my credit reports showed that the Ocwen account was charged off and settled, when in fact I paid it on time and never late. All that Equifax had to do is read their own~~

*past credit report I gave them. All Equifax and Experian had to do is read the Oewen letter where they admitted the mistake. I took the time and brought all this to their attention, but they ignored it all."*

As with other consumers who have suffered a similar plight, an important aspect of damages is the emotional and psychological burden of knowing they have been judged and mischaracterized as a possible *deadbeat* and someone who had stiffed a creditor post bankruptcy. All the defendants' have harmed the plaintiff and inflicted the nightmarish and undeserved new job of trying to clean up *their* mess, but based on pattern and practice that could never happen. The real harm done to the plaintiff was done by defendants' *Equifax and Oewen* for the reporting of *reinserted known re-aged derogatory data* that was inaccurate and misleading.

The GAO report, and many other reports that I study, define typical costs and time incurred in attempting to correct enduring damage created by industry misconduct. These costs and time range from a minimum of hundreds of hours and large dollars, to years of substantial legal costs well in excess of many people's ability to pay for their legal fees, lost work, and higher interest payments. In sum, no set of numbers can describe the nightmarish nature of the work all the defendants' have created for the plaintiff by their misconduct, but clearly they could have prevented the entire issue if they had just used good sound judgment and operated using reliable procedures to protect the plaintiffs credit file and right to his privacy.

As confirmed by industry practice, credibility in commercial matters is measured, and often sustained, or destroyed, by a consumer's reputation, character, and consumer report. This point is paramount in this case because of the type of reporting posted to the plaintiff's credit files. Many users of credit reports usual attitude is to just deny credit, opportunity, or

employment based on the possibility they may be looking at a possible *deadbeat* or someone who has *stiffed* other creditors post bankruptcy.

As my experience teaches, and as I have studied for years, people will develop a feeling of trust which often depends on their current credit worthiness, reputation, and performance. Filling out a loan or employment application under oath stating what your current liabilities are and stating you are who you say you are and signing it is a show of your truthfulness. Now when your new possible employer, lender, and/or insurance company receive your credit report and get a very different story then most feel this is a strong sign of dishonesty. Not disclosing a previous unpaid bad debt on your application is a no-no if the lender finds out you had a major derogatory item by pulling your credit report. Because of this reflection of a person's integrity and character, accuracy in your credit report is *paramount*.

I cannot overemphasize the human factor including human intervention needed during some consumer disputes involving accounts that were included in bankruptcy, but "paid as agreed" I base this opinion on my experience of handling hundreds of these exact types of disputes. When I had my company we re-listed almost daily. In fact Equifax would re-list for us (for a fee) during our re-scoring days.

I have found that these victims suffer legitimate financial and emotional harm, significant enough to create damages into the high dollar figures. They also suffer extraordinary aggravation, embarrassment, and loss of motivation and control. The repositories play a vital role in making sure the rules are followed by *ALL* and carried out by their subscriber/furnishers. They are the gatekeepers for those who have access to their proprietary information databases. The repositories become the trier of fact on all credit issues for reports they generate. When they have conflicting data or they have knowledge that there is the strong possibility of inaccurate

information in their system that was re-aged, and in my opinion a higher standard of protection must be implemented to assure compliance with the FCRA.

### Conclusion

I reserve the right to change, update, amend, and/or supplement this report as new information, documents, depositions, discovery, and/or new testimony is provided to me for my review. I have outlined the facts and documents that I have relied upon for which I have based my preliminary opinions.

Clearly Ocwen in my opinion reports in a reckless nature both originally and post dispute. When you have a mortgage loan in theory you can't have a charge off or a paid charge off. You can begin the foreclosure process generally after 90 days based on industry standards. I know of no way to go from a *possible* 30 day late (I2) to a charge off (I9) the next month. I see no evidence that the plaintiff was short on his payoff when his loan was "paid in full" and reconveyed through a refinance.

The subject account as I stated throughout my report clearly shows inconsistent reporting from *charged off*, to a *paid charge off*, then *discharged through bankruptcy*, to *paid as agreed* (10 months), then back to *included in bankruptcy*, and after all the defendants' were sued they got their act together to finally report the subject account accurately to reflect *"PAID AS AGREED"* with *NO* late payments. This final reporting should have been done after the plaintiff exercised his FCRA legal rights in 2003 and not in 2006 after he was forced to file this litigation.

Sometimes as professionals who know our own systems, we have to allow the consumer to get off the merry-go-round of blaming others, and follow the letter of the law/statute and do what's right instead of just quoting company policy and procedure. In this case we have the issue of an item reappearing on and off in the plaintiff's credit file that was in part because of the defendants' actions. In my opinion when Equifax and Experian first re-listed the account they

should have blocked it from being changed and reported the subject account as "paid as agreed". This is a very well known problem that was brought to Equifax and Experian's attention by my past company and other CRA's across the country, but EFX and XPN chose not to employ any type of fix to help consumers. This action by EFX and XPN harms many consumers across the country as it did this plaintiff.

The plaintiff in this case, after publication of the false information, can do little if anything to correct the damage caused to his credit risk, credit scores, credit reputation, integrity, and his overall credit worthiness. The FCRA requires reasonableness during the release and publication of consumer reports to third parties and then puts a *higher* standard on consumer reporting agencies after they receive notice of the possibility of inaccurate and misleading data into their privately owned, privately operated, and proprietary databases. This case clearly crossed the line on quality control, the use of good sound procedures, and on the quality of the defendants' reinvestigations. Clearly the defendant had notice of their re-inserting, non-re-listing, and their failure to show the subject account as "paid as agreed" numerous times over numerous years directly from the plaintiff and their own third party subscribers.

I state the above opinions with a reasonable degree of credit and professional certainty.

### Compensation

I am being compensated for my unique expertise at the rate of $250.00 per hour for non-testimonial consultation, expert report, or review and advice. I charge at the rate of $350.00 per hour for my court testimony and/or deposition. These fees do not include my expenses and travel, which are separately itemized.

This the 6th day of November, 2006

Respectfully submitted.

/s/ Richard F. Le Febvre
Richard F. Le Febvre
2532 N. 4th Street * Suite #333
Flagstaff, AZ 86004
928-773-0070

\4862417 1